BILAL A. ESSAYLI
Acting United States Attorney
IAN V. YANNIELLO
Chief, National Security Division
MAXWELL K. COLL (Cal Bar No. 312651)
ALEXANDER S. GORIN (Cal. Bar No. 326235)
Assistant United States Attorneys
National Security Division
NISHA CHANDRAN (Cal. Bar No. 325345)
Assistant United States Attorney
Major Frauds Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-1785/3190/2429
    Facsimile:  (213) 894-0141
    E-mail:    maxwell.coll@usdoj.gov
              alexander.gorin@usdoj.gov
              nisha.chandran@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 2:25-00181-RGK |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANT JOSE SOMARRIBA |
| v. | |
| JOSE SOMARRIBA, | |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Maxwell Coll, Nisha Chandran, and Alexander S. Gorin, hereby files its sentencing position for defendant JOSE SOMARRIBA.

    This sentencing position is based upon the attached memorandum

1  of points and authorities, the declaration of Assistant United States

2  Attorney Maxwell K. Coll, the declaration of Special Agent George

3  Jasek, the files and records in this case, the United States

4  Probation and Pretrial Services Office's presentence investigation

5  report, and such further evidence and argument as the Court may

6  permit.

7   Dated: October 6, 2025                 Respectfully submitted,

8                                           BILAL A. ESSAYLI
                                            Acting United States Attorney
9
                                            IAN V. YANNIELLO
10                                          Assistant United States Attorney
                                            Chief, National Security Division
11

12                                              /s/ *Maxwell Coll*
                                            ─────────────────────────────
13                                          MAXWELL COLL
                                            NISHA CHANDRAN
14                                          ALEXANDER S. GORIN
                                            Assistant United States Attorneys
15
                                            STEFANIE SCHWARTZ
16                                          TAMARA LIVSHIZ
                                            Trial Attorneys
17                                          Criminal Division, Computer Crime
                                            and Intellectual Property Section
18
                                            Attorneys for Plaintiff
19                                          UNITED STATES OF AMERICA

20

21

22

23

24

25

26

27

28

2

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3

This case arises out of an international scheme to launder

4

millions of dollars stolen from U.S. victims of cryptocurrency

5

investment scams (also known as "pig butchering" scams).  The

6

government has charged by indictment six defendants involved in the

7

money-laundering network, five of whom have pleaded guilty and one of

8

whom remains a fugitive.[1]  The government has also charged by

9

information three other individuals involved in the scheme, all of whom

10

have also pleaded guilty, including this defendant.[2]  Defendant JOSE

11

SOMARRIBA ("defendant") is the fifth defendant to be sentenced of the

12

nine individuals charged.  Defendant was directly involved in the

13

receipt of victim funds and the conversion of victim funds to the

14

cryptocurrency Tether.

15

On April 14, 2025, defendant pleaded guilty pursuant to a plea

16

agreement to one count of criminal conspiracy to operate an

17

unlicensed money transmitting business, in violation of 18 U.S.C.

18

§ 371.  (Dkts. 3, 13.)  In the plea agreement, defendant agreed to a

19

base offense level of 8; that defendant laundered funds more than

20

$25,000,000, such that a +22 specific offense characteristic must be

21

applied; and that defendant was in the business of laundering funds,

22

such that another +4 enhancement must be applied.  (Dkt. 35 at 8.)

23

24

---

25

[1] All of the indicted defendants are in cases pending before

26

this Court.  <u>See</u> <u>United States v. Lu Zhang, Joseph Wong, Justin
Walker, and Hailong Zhu</u>, 2:23-00596-RGK-3; <u>United States v. Daren Li</u>

27

<u>and Yicheng Zhang</u>, 2:24-393-RGK.

[2] <u>See</u> <u>United States v. Shengsheng He</u>, 2:25-CR-00175-RGK; <u>United</u>

28

<u>States v. Jose Somarriba</u>, 2:25-CR-00181-RGK; and <u>United States v.</u>
<u>Jingliang Su</u>, 2:25-CR-00362-RGK.

1    The United States Probation and Presentence Office ("USPPO")

2    issued its Presentence Report ("PSR") on September 9, 2025.  (Dkt.

3    33.)  The PSR calculated a total offense level of 29, which included

4    a base offense level of 8 plus a 22-level increase because the loss

5    attributable to defendant was greater than $25,000,000 (PSR ¶¶ 77-

6    78); a four-level increase because defendant was in the business of

7    laundering funds (PSR ¶ 80); a two-level increase for defendant's

8    supervisory role in the offense (PSR ¶ 84); and a three-level

9    reduction for defendant's acceptance of responsibility (PSR ¶¶ 88-

10   89).

11   Based on a total offense level of 29, and a Criminal History

12   Category of I, the PSR calculated an advisory Guideline range of 87

13   to 108 months' incarceration.  (PSR ¶ 132.)  The PSR notes that the

14   statutory maximum term of imprisonment is five years.  (PSR ¶ 131.)

15   The government agrees with the PSR's criminal history

16   calculation but disagrees with some aspects of the PSR's offense-

17   level calculation.  For reasons explained in more detail below, the

18   government does not agree that defendant should receive a two-level

19   increase for his role in the offense, in fact, the government

20   believes a two-level decrease for minor role is appropriate.  Because

21   the government does not believe the supervisory role enhancement

22   applies, the government also believes that defendant is entitled to a

23   two-level reduction to his offense level based on his status as a

24   zero-point offender.  Lastly, the government believes that a further

25   five-level reduction is appropriate for the reasons stated in its

26   contemporaneously filed motion.  In light of this, the total offense

27   level calculation decreases to 22 and the resulting advisory

28

Guidelines range is 41 to 51 months.  Thus, the government respectfully requests that the Court sentence defendant to: (1) a Guidelines term of 41 months' imprisonment; (2) three years of supervised release; (3) restitution in the amount of $26,867,242.44; and (4) a mandatory special assessment of $100.

## II.   OVERVIEW OF STRUCTURE OF SCAM AND MONEY LAUNDERING NETWORK

As described in Count One of the Information, the conspiracy involved an international network of co-conspirators who scammed U.S. victims and laundered victim money through U.S. shell companies, international bank accounts, and cryptocurrency wallets.

**International Scammers**:  First, unknown co-conspirators largely residing overseas (not defendant JOSE SOMARRIBA or any of the charged co-conspirators in the related cases) contacted U.S. victims directly through unsolicited social-media interactions, telephone calls and messages, and online dating services.  These co-conspirators gained the trust of victims by establishing either professional, friendly, or romantic relationships with them.  After gaining the victims' trust, the co-conspirators promoted fraudulent cryptocurrency investments to the victims.  Co-conspirators established spoofed domains and websites that often resembled legitimate cryptocurrency trading platforms.  In some executions of the scheme, co-conspirators fraudulently induced victims into investing in cryptocurrency through these fraudulent and spoofed investment platforms.  In other executions of the scheme, co-conspirators fraudulently induced victims into investing in cryptocurrency by sending funds via wire transfers to U.S.-based bank accounts.  Co-conspirators fraudulently

represented to victims that their investments were appreciating when, in fact, those funds were stolen.

**Domestic Laundering Networks**: Second, a group of domestic money launderers received victim funds in U.S.-based bank accounts established on behalf of U.S. shell companies and caused the further transfer of victim funds to domestic and international bank accounts. Defendants in the related case, United States v. Lu Zhang, et al., 23-CR-596-RGK, fit within this category of co-conspirators. These defendants, among other co-conspirators, worked together to register shell companies with the California Secretary of State and/or open bank accounts in the names of those shell companies with U.S. financial institutions, including Bank of America ("BoA") and JPMorgan Chase ("JPMC"). The shell company accounts received bank wires from victims of the scheme throughout the United States. These individuals discussed when and how to receive and execute interstate and international wire transfers of victim funds, arranged for the transfer of the fraudulently obtained proceeds via interstate and international wire transfers, and caused wire transfers to be sent through various intermediary bank accounts before reaching their final beneficiary. These defendants and other money movers traveled to financial institutions within the Central District of California to access funds in the bank accounts used to launder fraud proceeds, called the banks to inquire about the status of the funds, and closely monitored the bank accounts, insuring victim funds continued to flow into and out of the accounts.

**Bahamian Cryptocurrency Converters**: Third, virtually all of the victim funds flowed from U.S. bank accounts to two bank accounts at

the Bahamian financial institution Deltec Bank & Trust ("Deltec Bank"), referred to in related court documents as Bahamas Account #1 and Bahamas Account #2.  Defendant JOSE SOMARRIBA and defendants Shengsheng He and Jingliang Su in the related cases have been charged with setting up the Bahamian entity Axis Digital Limited and the affiliated bank account Bahamas Account #1.  Once these defendants received the victim funds from transfers the money movers initiated, the Bahamian cryptocurrency converters would cause the funds to be converted from U.S. dollars to the cryptocurrency Tether, or USDT.[3] After the funds were converted to USDT, defendant JOSE SOMARRIBA and the Bahamian cryptocurrency converters would cause Deltec Bank to transfer the USDT to a cryptocurrency wallet controlled by individuals overseas.  On September 8, 2025, the Court sentenced Shengsheng He to 51 months' imprisonment.

**Final Distribution of Victim Funds**:    Fourth, after co-conspirators laundered the victim funds from U.S.-based bank accounts to the Bahamian bank accounts and converted the funds to USDT, a network of foreign-based individuals would receive the cryptocurrency in a virtual currency wallet.  After receiving the funds in the virtual currency wallet, these co-conspirators would distribute the USDT to foreign criminals running the scam centers overseas,

---

[3] Tether, or "USDT," is a type of cryptocurrency known as a stablecoin pegged to the U.S. dollar.  Thus, one USDT always equals one U.S. dollar.

5

including in the Kingdom of Cambodia.  The figure below shows the
overall flow of funds in the charged scheme:



## III. DEFENDANT PARTICIPATED IN THE CONVERSION OF VICTIM FUNDS TO TETHER AND THE DISSIPATION OF VICTIM PROCEEDS TO CAMBODIA

As stated in the plea agreement (Dkt. 3 at 19-24):  Beginning
from at least November 2021, and continuing through at least July
2023, in Los Angeles County, within the Central District of
California, and elsewhere, defendant knowingly conspired with Co-
Conspirator 1 (Shengsheng He), Co-Conspirator 2 (Jingliang Su), Co-
Conspirator 3 (Daren Li), and others, to operate an unlicensed money
transmitting business.  Defendant participated in and knew of the
agreement to operate an unlicensed money transmitting business and
intended to help accomplish the objects of the conspiracy.  The
unlicensed money transmitting business received millions of dollars
in victim funds from U.S. persons targeted in cryptocurrency
investment scams, also known as "pig butchering scams," and other

related schemes.  Defendant's unlicensed money transmitting business converted virtually all of the victim proceeds to the cryptocurrency Tether (or USDT) for a commission.  After converting the proceeds, the unlicensed money transmitting business facilitated the transfer of the USDT to a cryptocurrency wallet controlled by individuals in Cambodia.

***Defendant Sets Up Axis Digital and Opens Account at Deltec Bank***

Defendant conspired to operate Axis Digital Limited ("Axis Digital"), an entity that he incorporated under the laws of the Commonwealth of the Bahamas on or about November 30, 2021.  Using the Axis Digital business entity, defendant and Shengsheng He opened a bank account ("Bahamas Account #1") with the Bahamian financial institution Deltec Bank.  Before opening Bahamas Account #1, defendant and Shengsheng He traveled to the Bahamas to meet with Deltec Bank employees and discussed a money transmitting business whereby defendant and his co-conspirators would convert U.S. dollars into USDT for a commission.

Defendant worked with Shengsheng He to set up the Axis Digital business entity in the Bahamas and met with Deltec Bank employees on multiple occasions to facilitate the creation of Bahamas Account #1.

***Defendant Facilitated the Transfer of Funds Required to Open Bahamas Account #1***

After setting up the Axis Digital business entity and Bahamas Account #1, defendant, Shengsheng He, Jingliang Su, Daren Li, and others conspired to transfer roughly $1 million to defendant's cryptocurrency account to demonstrate a proof of funds to Deltec

1   Bank.  The proof of funds was required for Deltec Bank to allow wire

2   transfers into Bahamas Account #1 from other financial institutions.

3          On or around June 8, 2022, Shengsheng He introduced defendant,

4   Jingliang Su, and Daren Li to each other on an encrypted messaging

5   platform and participated in discussions about the transfer of

6   roughly $1 million in cryptocurrency to defendant.  Defendant also

7   participated in discussions about Shengsheng He returning the roughly

8   $1 million in cryptocurrency to the co-conspirators after sending a

9   proof of funds to Deltec Bank.  Defendant in fact received the $1

10  million from co-conspirators and sent a proof of funds to Deltec

11  Bank, which enabled Axis Digital to begin receiving wires from other

12  financial institutions.

13  ***Defendant Traveled to Cambodia to Discuss the Transfers of***

14  ***Cryptocurrency to Individuals Involved in Scam Centers***

15         In July 2022, after opening Bahamas Account #1, but before funds

16  transferred into Bahamas Account #1 from victims in the United

17  States, defendant, Shengsheng He, and Jingliang Su traveled to Phnom

18  Penh, Cambodia, to meet with Daren Li and other co-conspirators based

19  in Cambodia and elsewhere.  During the trip to Cambodia, defendant

20  was present while several co-conspirators discussed in Mandarin the

21  transfer of money from U.S. bank accounts to Bahamas Account #1, and

22  the subsequent conversion of those funds to USDT for a commission.

23  Co-conspirators also discussed the transfer of USDT from Bahamas

24  Account #1 to a cryptocurrency wallet that co-conspirators in

25  Cambodia controlled.

26         During the July 2022 trip to Cambodia, defendant and co-

27  conspirators traveled within the greater Phnom Penh region to at

28

8

least one compound wherein co-conspirators conducted cryptocurrency investment scams, also known as "pig butchering scams." Defendant later came to understand that the funds flowing from U.S. financial institutions to the Axis Digital bank account in the Bahamas included money from victims of these cryptocurrency scams.

***Axis Digital Limited Received More Than $36 Million From U.S. Bank Accounts Opened in the Names of U.S. Shell Companies***

Between June 2022 and July 2023, the Axis Digital bank account received at least approximately $36,905,259 from U.S. bank accounts set up in the names of U.S. shell companies. Each of the shell companies received these funds from U.S. victims of cryptocurrency investment scams or related schemes. This includes the following shell entities:

     a. B&C Commerce LLC, a shell company registered with the California Secretary of State on or about January 21, 2022, with a principal address in San Gabriel, California;

     b. Jimei Trading Inc., a shell company registered with the California Secretary of State on or about May 15, 2022, with a principal address in San Gabriel, California;

     c. YXJ Trading Corporation, a shell company registered with the California Secretary of State on or about July 30, 2022, with a principal address in Monterey Park, California;

     d. YYJ Consulting Corporation, a shell company registered with the California Secretary of State on or about August 25, 2022, with a principal address in Monterey Park, California;

     e. Sea Dragon Trading, LLC, a shell company registered with the California Secretary of State on or about September 8, 2022,

with a principal address in Alhambra, California;

f.   SMX Beauty Inc., a shell company registered with the California Secretary of State on or about October 13, 2022, with a principal address in Monterey Park, California;

g.   SMX Travel Inc., a shell company registered with the California Secretary of State on or about October 13, 2022, with a principal address in Monterey Park, California; and

h.   Sea Dragon Remodel, Inc., a shell company registered with the California Secretary of State on or about October 17, 2022, with a principal address in Vernon, California.

Defendant and his co-conspirators created so-called digital transaction agreements and "Know Your Customer" or "KYC" forms associated with the U.S. shell companies, including those listed in Paragraph 8, detailing the conversion of millions of dollars to USDT. The agreements each listed Axis Digital as the business entity conducting the conversion of funds.  The agreements each listed the same cryptocurrency address beginning with TRteo (the "TRteo Address") as the receiving wallet.  Defendant knew the KYC forms for the shell companies and related wire transfers did not reflect legitimate business transfers.

***Defendant Directed the Transfer of Funds to a Cryptocurrency Wallet Controlled by Co-Conspirators in Cambodia***

When the U.S. bank accounts set up in the names of shell companies transferred victim funds to Bahamas Account #1, defendant and his co-conspirators directed Deltec Bank employees to convert the funds into USDT and to transfer the funds to the TRteo Address. Defendant directly messaged with Deltec Bank employees to coordinate

10

these conversions and money transfers.  Defendant and his co-conspirators converted all of the funds in Bahamas Account #1 – more than $36 million – to USDT.  Defendant and his co-conspirators then directed the transfer of all of the funds to the TRteo Address.

Defendant earned a commission on wire transfers into Bahamas Account #1 or the subsequent transfer of USDT to the TRteo Address. Defendant received ledgers from co-conspirators detailing the commissions he earned on wire transfers.

Defendant agrees that Axis Digital laundered at least $36,905,259 in funds from U.S. shell companies.

***Defendant Did Not Comply With Money Transmitting Business Regulations and Knew the Source of Funds Derived from a Criminal Offense***

Defendant knowingly conducted, controlled, managed, supervised, directed, or owned all or part of the Axis Digital money transmitting business, which affected interstate and foreign commerce.  The Axis Digital business was unlicensed in that it failed to comply with the money transmitting business regulation requirements under 31 U.S.C. § 5330 and the regulations promulgated under that section.  Defendant eventually came to understand that at least a portion of the funds flowing into Bahamas Account #1 were derived from a criminal offense or were otherwise intended to be used to promote or support unlawful activity.

**IV.  THE USPPO'S CALCULATIONS**

    **A.    The Government Concurs with USPPO's Criminal History Calculations and Some of Their Guidelines Offense Level.**

The USPPO determined that defendant has zero criminal history points.  (PSR ¶ 101.)  Defendant thus falls within Criminal History Category I.  (<u>Id</u>.)  The government concurs with this calculation.

11

The PSR also calculated, based on the above facts, a total offense level of 33. (PSR ¶ 92.) The government concurs with the base offense level of 8 calculated by the PSR. (PSR ¶ 57.) The PSR's total offense level calculation is as follows:

| | | | |
|---|---|---|---|
| Base Offense Level: | 8 | U.S.S.G. §2S1.1(a)(2) | |
| Loss Amount More Than $25,000,000: | +22 | U.S.S.G. § 2B1.1(b)(1)(L) | |
| Business of Laundering | +4 | U.S.S.G. § 2S1.1(b)(2)(C) | |
| Aggravating Role | +2 | U.S.S.G. § 3B1.1(c) | |
| Acceptance of Responsibility: | -3 | U.S.S.G. § 3E1.1(a)-(b) | |

_____

TOTAL:                    33

Based on that calculation, the USPPO recognized that a total offense level of 33 and a Criminal History Category of I yield an advisory Guidelines range of 135 to 168 months' imprisonment, though the statutory maximum sentence is 60 months. (PSR ¶ 132.)

**B.    The Government Believes Defendant Should Receive a Mitigating, Not Aggravating, Role Adjustment.**

As explained in more detail later in this memorandum, the government believes defendant should get a two-level decrease for his minor role in the offense rather than the two-level increase for an aggravating role proposed in the PSR. If, as the government proposes, defendant is not subject to the aggravating role enhancement, then he would also receive the zero-point offender adjustment of minus two offense levels.

**C.    The Government Requests a 5-Level Departure.**

The government has filed a contemporaneous document requesting a five-level departure.

* * *

Accordingly, the government believes the total offense level calculation for defendant is as follows:

| | | |
|---|---|---|
| Base Offense Level: | 8 | U.S.S.G. §2S1.1(a)(2) |
| Loss Amount More than $25,000,000: | +22 | U.S.S.G. § 2B1.1(b)(1)(L) |
| Business of Laundering | +4 | U.S.S.G. § 2S1.1(b)(2)(C) |
| Minor Role | -2 | U.S.S.G. § 3B1.2(b) |
| Acceptance of Responsibility: | -3 | U.S.S.G. § 3E1.1(a)-(b) |
| Zero Point Offender: | -2 | U.S.S.G. § 4C1.1 |
| Departure | -5 | Contemporaneous Filing |

_____

| | | |
|---|---|---|
| TOTAL: | 22 | |

Based on a Criminal History Category of I, the advisory Guidelines range is 41 to 51 months' imprisonment.  The government's recommended sentence is at the low-end of this advisory Guidelines range: 41 months' incarceration.

**D.    Joint and Several Restitution Obligation**

The government submits that defendant SHENGSHENG HE should be held jointly and severally liable with the below-listed convicted co-participants (which list includes the defendant) in the offense conduct for the amount of restitution ordered in this judgement:

- Lu Zhang (Case No. 23-CR-596-RGK-1)

- Joseph Wong (Case No. 23-CR-596-RGK-2)

- Justin Walker (Case No. 23-CR-596-RGK-3)
- Daren Li (Case No. 24-CR-311-RGK-1)
- Yicheng Zhang (Case No. 24-CR-311-RGK-2)
- Shengsheng He (Case No. 25-CR-175-RGK)
- Jingliang Su (Case No. 25-CR-362-RGK)

The victims' recovery remains limited to the amount of their loss and the defendant's liability for restitution ceases if and when the victims receive full restitution as to the defendant, or when the victims are made whole, whichever is earlier.

The government attaches hereto as Exhibit 1 to the Declaration of Special Agent John Jasek an anonymized list of victims with their respective loss amounts. The total restitution owed is **$26,867,242.44.** The victims listed in this document are individuals who sent funds to shell companies that transferred funds to Bahamas Account #1, and who self-reported their losses to the government. The amount listed is the amount the government can attribute to the shell company bank accounts based on the self-reporting documentation. Because victims were often re-victimized and/or told to send their funds to different money-laundering networks, the loss amount for each victim may exceed the amount attributable to this domestic money-laundering cell.

**V.    VICTIM IMPACT STATEMENTS**

The government has submitted contemporaneously with this filing a sealed document attaching victim impact statements.

**VI.   THE GOVERNMENT RECOMMENDS 41 MONTHS' INCARCERATION**

The government recommends that the defendant be sentenced to a Guidelines term of 41 months' imprisonment, a three-year period of

14

1  supervised release, a $100 special assessment, and restitution of

2  $26,867,242.44.  Such a sentence is sufficient, but not greater than

3  necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a).

4  **A.    Need to Afford Adequate Deterrence**

5  Economic crimes like the charged money laundering scheme are

6  quintessentially deterrable.  "Because economic and fraud-based

7  crimes are 'more rational, cool, and calculated than sudden crimes of

8  passion or opportunity,' these crimes are 'prime candidate[s] for

9  general deterrence.'"  See United States v. Martin, 455 F.3d 1227,

10  1240 (11th Cir. 2006) (quoting Stephanos Bibas, White-Collar Plea

11  Bargaining and Sentencing After *Booker*, 47 Wm. & Mary L. Rev. 721,

12  724 (2005)).  In fact, Congress, in drafting section 3553, confirmed

13  that this common-sense principle was one of the driving forces for

14  including deterrence among the goals of sentencing.  See S. Rep. No.

15  98-255, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("To

16  deter others from committing the offense . . . is particularly

17  important in the area of white collar crime.").  Indeed, Congress was

18  expressly concerned with the fact that "[m]ajor white collar

19  criminals often are sentenced to . . . little or no imprisonment,"

20  which the offenders disregard as "a cost of doing business."  Id.  As

21  Judge Bea has written, "bank fraud, unlike an assault in a tavern or

22  even domestic abuse, tends to be a planned, deliberate crime, which

23  allows plenty of time for reflection, calculation of the odds of

24  success or failure, and the ultimate decision."  United States v.

25  Edwards, 595 F.3d 1004, 1021 (9th Cir. 2010) (Bea, J., concurring).

26  Conspiracies like the one involved in this case are the lifeline

27  for international cryptocurrency investment frauds.  The funds

28

transferred overseas and converted to cryptocurrency give criminal syndicates the means to traffic humans and run scam compounds. Individuals who recklessly set up international bank accounts and convert tens of millions of dollars must be deterred from operating money transmitting businesses that funnel victim proceeds overseas. Defendant's conduct was reckless at best.  After personally traveling to Cambodia to meet with the recipients of the funds and visit a scam compound, defendant's company and Bahamian bank account received millions of dollars from U.S. shell companies.  Defendant and his co-conspirators converted virtually all of the proceeds to Tether and directed the transfer of those funds to the cryptocurrency address controlled by persons defendant met in Cambodia, without regard for the sources of funds.  The Court should deter this reckless approach to conspiring to operate money services businesses.

**B.  Seriousness of the Offense**

This is a case in which the sentencing guidelines appropriately identify the factors that make defendant's conduct so serious: the millions of dollars in loss to numerous victims throughout the United States and the business of laundering funds.  Together, these factors speak to a sophisticated scheme that devastated the lives of many U.S. citizens.  The effectiveness of the crime also prevented the government from freezing, seizing, or recovering any of the direct victim proceeds.  The funds were dissipated across unhosted virtual wallets controlled by individuals overseas, primarily in Southeast Asia.

1

**C.    Need to Avoid Unwarranted Disparities**

2    Section 3553(a)(6) requires the Court to minimize sentencing

3    disparities among similarly situated defendants.  One way of doing so

4    is to correctly calculate the Guidelines range and then sentence

5    defendants within that range.  See United States v. Treadwell, 593

6    F.3d 990, 1011 (9th Cir. 2010) ("Because the Guidelines range was

7    correctly calculated, the district court was entitled to rely on the

8    Guidelines range in determining that there was no 'unwarranted

9    disparity' . . . ."); Gall v. United States, 552 U.S. 38, 54 (2007)

10    ("[A]voidance of unwarranted disparities was clearly considered by

11    the Sentencing Commission when setting the Guidelines ranges.").  The

12    government's within-Guidelines recommended sentence avoids an

13    unwarranted disparity with similarly situated defendants.

14

**D.    Defendant Had a Minor Role in the Offense**

15    The government disagrees with the USPO's analysis finding

16    defendant had an aggravating role in the offense, and instead

17    believes he is entitled to a downward adjustment for having a minor

18    role in this scheme. Generally, "[t]he defendant bears the burden of

19    proving that [s]he is entitled to a downward adjustment based on his

20    role in the offense." United States v. Awad, 371 F.3d 583, 591 (9th

21    Cir. 2004).

22    To be eligible for a minor role adjustment, a defendant must be

23    "less culpable than most other participants in the criminal

24    activity," U.S.S.G. § 3B1.2(b), cmt. 5, and "substantially less

25    culpable than the average participant in the criminal activity," id.

26    at cmt. 3(A). While the Ninth Circuit has held that courts should

27    compare a defendant's culpability to "all participants in the

28

17

1  criminal scheme for which he was charged" even if those co-
2  participants are not charged, United States v. Rojas-Millan, 234 F.3d
3  464, 472 (9th Cir. 2000), it does not require "a comparison to
4  unknown persons one might assume participated but about whom there is
5  no evidence of their actual participation." United States v.
6  Dominguez-Caicedo, 40 F.4th 938, 965 (9th Cir. 2022).

7        Here, defendant was recruited to the scheme and induced to
8  participate by Shengsheng He, who notably did not receive an
9  aggravating role adjustment at his sentencing. See United States v.
10 Shengsheng He, Case No. 2:25-CR-171-RGK.  The plan to set up the
11 Deltec Bank accounts and use them to launder fraud funds also appears
12 to have been driven by co-conspirator Shengsheng He.  He connected
13 defendant to the fraud network that obtained the pig butchering
14 funds.  Further, defendant was induced to travel to Cambodia by He
15 and met with leaders of the scheme who spoke almost exclusively in
16 Mandarin, which defendant neither speaks nor understands.
17 Coordination of the scheme to funnel millions of victim funds appears
18 to have occurred in his presence, but without his ability to fully
19 understand and appreciate what was going on.  This suggests defendant
20 was more similar to a pawn or an operative who was less involved in
21 the broader scheme.  While defendant played an active role in
22 establishing the bank accounts in the Bahamas and facilitating the
23 movement of fraud funds, the facts show that defendant was less
24 knowledgeable about the criminal scope of the activity that the
25 average co-conspirator, including Shengsheng He, Jingliang Su, and
26 Daren Li.

27

28
                                  18

**VII. CONCLUSION**

For the foregoing reasons, the government recommends that the Court sentence defendant to 41 months' imprisonment, three years' supervised release, a $100 special assessment, and restitution of $26,867,242.44.

1

**DECLARATION OF GEORGE JASEK**

2      1.   I am a Special Agent ("SA") with the United States Secret
3  Service and have been so employed since March 2018.  I am currently
4  assigned to the Criminal Investigative Division in Washington,
5  District of Columbia.  I have knowledge of the facts set forth herein
6  and could and would testify to those facts fully and truthfully if
7  called and sworn as a witness.

8      2.   Attached hereto as **Exhibit 1** is a list of U.S. victims who
9  sent funds to shell companies that transferred their funds to Bahamas
10  Account #1.  The amount of the loss is based on a government analysis
11  of self-reporting documentation and shell company records.

12      3.   I declare under penalty of perjury under the laws of the
13  United States of America that the foregoing is true and correct.
14  DATED: October 6, 2025.

15

16

17

18                          _____
                                GEORGE JASEK
19

20

21

22

23

24

25

26

27

28

1

## DECLARATION OF AUSA MAXWELL COLL

2    I, Maxwell Coll, hereby declare and state:

3    1.    I am an Assistant United States Attorney with the National

4 Security Division at the U.S. Attorney's Office for the Central

5 District of California.  I am one of the prosecutors assigned to this

6 case.

7    2.    This declaration is made in support of the government's

8 sentencing position for defendant Jose Somarriba.

9    3.    Attached hereto as **Exhibit 2** is a true and correct copy of

10 a compilation of relevant victim impact statements provided to the

11 United States Attorney's Office as of the date of this filing.

12    4.    I declare under penalty of perjury under the laws of the

13 United States of America that the foregoing is true and correct.

14 DATED: October 6, 2025.

15

16

17

18                         _____
                           MAXWELL COLL
19                         Acting Deputy Chief,
                           National Security Division

20

21

22

23

24

25

26

27

28